[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this case, the plaintiff bases his case on three theories of liability: negligence, recklessness and slander per se. The plaintiff claims that Eastern is a franchise holder" operating a cable television system in the New London area. As a "Community Access Provider" Eastern is required to provide "community access" (§ 16-333-31 (6) and16-333-33a(b)) by supplying an "equipped studio" under the regulations and channel capacity — Channel 25 is the designated channel. Eastern also provides phone lines for community access to the public access users and according to the plaintiff, paid and volunteer personnel" to assist in the broadcasting of the live phone calls" that are received during public access shows. CT Page 2999
The plaintiff is a businessman serving the New London area. On two dates in March, 1999, a program entitled "Views From the Field" was broadcast live over Channel 25 by a public access user and the program used the phone lines supplied by Eastern. On the two shows referred to phone calls came in and the callers made what the plaintiff claims were remarks that were slanderous per se.
The plaintiff basically alleges that Eastern was negligent because it failed to screen or delay calls or identify callers or terminate calls once slanderous comments began, failed to instruct callers, operators and show hosts as to the proper use of the phones and failed to train operators in violation of state regulations. The recklessness count in large part restates the negligence allegations but also alleges that the various wrongful acts were continually allowed to go on despite notice that such acts were going on or had occurred. The slander per se count alleges that Eastern knew or should have known that its phone lines were used to make slanderous remarks. The defendant Eastern has filed a motion for summary judgment against all the counts of the complaint. The standards to be applied in deciding motions for summary judgment are well-known. If there is a genuine issue of material fact the court cannot decide it. However, if, as a mater of law, the plaintiff's allegations are not viable the motion should be granted. The parties do not so much appear to differ on the facts but argue that state regulations and federal law require a result favorable to their side of the argument, given the facts of the case.
In the first brief submitted by the defendant Eastern, a straightforward argument is made. First, Eastern argues that the "essential elements" of a cause of action in negligence do not exist here because only when a "duty is found to exist does the trier of fact then determine whether the defendant violated the duty in the particular situation at hand." R.K. Construction, Inc. v. Fusco Corp., 231 Conn. 381,384 (1994). The argument goes further than an attack just on the negligence count because referring to state regulations and federal statutory law Eastern argues that "Not only did Eastern not have a duty to prevent the broadcast of the alleged slanderous comments, but it was legally prohibited from asserting editorial control." (Brief, 1/24/00.)
The arguments goes as follows — under the state regulations, Eastern is a "Community Access Provider" and is required to provide "Community Access." "Community Access" includes public access, educational access and governmental access. See Connecticut Regulations § 16-333-31 (6) and § 16-333-33a(b). The latter section explicitly provides that as to an entity like Eastern "No company shall exert editorial control over the content of such programming." Our state is required to have such a policy since it is a mandate of the federal CT Page 3000 statutory scheme concerning cable television. See 47 U.S.C. § 321, et seq.; see Glendora v. Cablevision Systems Corp., 45 F.3d 36, 38 (CA, 1995); Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 698-700
(1984). In 47 U.S.C. § 531 (e) it states that:
 "Subject to section 544(d) of this title, a cable operator shall not exercise any editorial control over any public educational, or governmental use of channel capacity provided pursuant to this section, except a cable operator may refuse to transmit any public access program or portion of public access program which contains obscenity, indecency or nudity."
Based on the foregoing Eastern maintains not only did it not have a duty to prevent the alleged slander but if it did so, Eastern would have violated federal and state law.[1]
The plaintiff counters by referring to regulation 16-333-31 (8) which defines the "equipped studio" that shall be provided to public access users of Channel 25. Nowhere in the definition of an "equipped studio" is there any mention of phones and specifically the provision of phones and the assistance of Eastern employees to operate the phones. State law and federal law do not "mandate that Eastern provide phone lines for public access programming" (Brief, 5/25/00) — they do not explicitly mention phones at all. Eastern admitted in its answer that it voluntarily provided the phone lines and the Public Access Director of Eastern at a deposition admitted Eastern was not required to provide public access users with phone lines. The plaintiff then cites Coville v. LibertyMutual Ins. Co., 57 Conn. App. 275 (2000); Zatkin v. Katz, 126 Conn. 445
(1926) and Victoria v. Wilson, 1999 WL 786356 (Conn.Sup.) for the proposition that if a party gratuitously undertakes an act that party will be liable for performing it negligently. In language that is perhaps a tad over dramatic, this court itself in Victoria v. Wilson said: "No rational social policy should encourage affirmative acts of negligence in a situation where the actor could have chosen to do nothing at all." just so argues the plaintiff the fact that Eastern could not exercise editorial control does not relieve it from liability. Eastern could simply not have provided the phone lines.
Furthermore, the plaintiff says that cable operators like Eastern cannot "exercise editorial control" over public access shows as described in statutes and regulations. Federal statutes and regulations do not mandate that Eastern provide phone lines nor even allude to the fact that Eastern can provide them voluntarily. Eastern, therefore, could have exercised editorial control over the use of phone lines since, as noted, their use was not mandated. CT Page 3001
In any event, the plaintiff maintains that Eastern is not prohibited by47 U.S.C. § 531 (e) or state regulation 16-333-33c(9) from exercising editorial control over slanderous speech. McClellan v. Cablevision ofConn., Inc., 149 F.3d 161 (CA 2, 1996) did say that the interest sought to be protected by § 531(3) are akin if not the same as those protected by the First Amendment. But as the plaintiff points out there are certain categories of speech to which the protection of the First Amendment does not extend and "libelous speech has been held to constitute one such category." Bose Corporation v. Consumers Union ofUS, Inc., 466 U.S. 485, 504 (1984); citing Chaplinsky v. New Hampshire,315 U.S. 568, 572 (1942). This argument is somewhat conclusory because even though it is true that First Amendment protection does not extend to libelous speech it assumes that state and federal law cannot protect cable operators from liability for the carrying of such speech on public access channels which they are required by law to set up and over which they cannot exercise any editorial control. That, in fact, is what must be decided — can they exercise editorial control and are they permitted to do so? If they cannot there cannot be any liability. cf. Restatement (Second) Torts § 592A — there can be no liability for defamation where publication is required by law.
In any event, the plaintiff argues that whether statutes and regulations permit editorial control in the ordinary case here something occurred which deprives Eastern of the protection § 531(e) might be said to afford. In regulation § 16-33a-11, the cable operator's required level of support to public access users is set forth. According to the plaintiff, Eastern employees went far beyond the required level of support and participated in the actual preparation, production, editing and broadcasting of the public access show in question. The deposition testimony of Ms. Rickard, Eastern's Public Access Director is referred to where she testified that during the show Eastern employees would switch the cameras, regulate the audio, generate the characters that appeared on screen. As to phone calls, Rickard testified that an Eastern employee would field them. If one came in and the caller requested to speak to the director of the show in question, the caller was put on hold and the show host was informed of that. Eastern did not screen any of the calls — Rickard claimed that would constitute "editorial control." Also, Eastern employees did not utilize a delay system or take any steps to ascertain a caller's identity.
Mrs. Rickard also said that once calls are transferred to the studio and the host of the show, the Eastern employees in the control room could not terminate the call.
The foregoing discussion presents the preliminary positions taken by CT Page 3002 each side. The court will now try to decide the difficult issues presented based on these arguments. The court could find no case, state or federal, which dealt with the specific issues raised by this case.
This case has been well-briefed and especially well-argued. The court believed and the parties might even agree that resolution of the issues presented really turns on an interpretation of subsection 558 of the Federal Cable Communications statute and § 531(e) and § 544(d) which is referred in § 531(e). ln other words, when all is said and done, § 558 defines the ambit of immunity from suit given cable operators like Eastern for what happens on these public access shows — that statute in turn is directly related to § 531(e) and the reference therein to § 544(d) which discusses editorial control. That is so because if you cannot control the contents by government fiat, how can you be sued. In other words, § 558 and § 531(e) have to be interpreted in a way which makes them consistent with each other. Finally, despite all this, if Eastern actively participated in the preparation production broadcast and distribution of the alleged defamatory programming could it be said that Eastern, in any event, is liable? For the purposes of this motion, the foregoing discussion appears to present a legal question in the sense that, for example, even as to the last mentioned contention Eastern has not presented counter-affidavits to the substance of the Rickard deposition.
The court will now discuss § 558 and § 531(e) and § 544 (d) and will first discuss the content of those statutes.
Section 558 states, in relevant part, that nothing in the federal Cable Communications Act (47 U.S.C. § 521 et seq) "shall be deemed to affect the. . . . civil liability of. . . . cable operators pursuant to the Federal, State or local law of libel, slander, obscenity, incitement, invasions of privacy, false or misleading advertising or other similar laws except that cable operators shall not incur any suchliability for any program carried on any channel designated for public,educational. governmental use . . . unless the program involves obscenematerial." (Emphasis added to relevant portions of statute.)
Section 531(e) was previously quoted, it in effect says that no editorial control shall be exercised by cable operators over the programs of public access users except that an operator like Eastern may refuse to transmit any program or portion thereof which contains "obscenity, indecency or nudity." There are two things that are interesting, at least to the court, about the language of § 531(e). First, "editorial control" is explicitly defined — it would involve a refusal to transmit the program or portions of it. Also, § 5319e) clearly states that its language is "subject to § 544(d)." But the language of that CT Page 3003 section of the act at first blush seems contradictory to the purpose of § 531 which is to limit editorial control only to program material which contains "obscenity, indecency or nudity." That is so because 544(d) says: "Nothing in this sub-chapter shall be construed as prohibiting a franchising authority and a cable operator from specifying, in a franchise or renewal thereof, that certain cable services shall not be provided or shall be provided subject to conditions, if such cable services are obscene, or are otherwise unprotected by the Constitution ofthe United States." (Emphasis added.) (See previous discussion of fact that libel and slander are not so protected.)
Turning first then to a discussion of 47 U.S.C. § 558 and its implications, the court will then discuss §§ 531(e) and 544(d) which are all interrelated.
 (a)
Section 558 is broadly written. It says, as noted, that nothing in the federal act shall affect civil liability under state law involving libel, slander, obscenity, incitement, invasions of privacy, false or misleading advertising or other similar laws except that there shall be no "such" liability for the content of any program "unless the program involves obscene material."
The plaintiff makes two substantive arguments as to why this statutory subsection, which as noted has preemptive effect over any state common law action, is not applicable to this case. He argues first that the active participation in the production and broadcast of this program by Eastern employees preclude giving Eastern "blanket immunity" under the statute; the deposition testimony of Ms. Rickard has been referred to in this regard.
But regulation 16-331a-11 mandates a wide range of support for public access users by cable operators and their employees. The introductory paragraph talks about the fact that the state regulatory department shall determine "on a case-by-case basis the level of support which each (cable operator) shall make available to the public to facilitate meaningfulcommunity access. (Emphasis added.) The DPUC shall among other things review "(3) the technical personnel to assist the access coordinator and to assist access users, as required." Subsection (5) provides for annual review by the department to determine whether "the number of personnel assigned to community access, and the amount of time spent by such personnel on community access are sufficient to facilitate meaningful community access." A training program must be set up — the cable operators would use their personnel to train public access users. Later subsections even require that cable operators, obviously through their CT Page 3004 employees efforts, promote viewing of the public access channel.
Despite the broad allegations of the complaint and the claims made in the plaintiff's briefs, nothing presented to the court in the form of the Rickard deposition indicates that Eastern employees did anything more than provide the technical assistance they were required to provide. This is not a case, for example, where an Eastern employee in the control room who was fielding incoming calls encouraged the making of slanderous remarks, nor is there any indication even that such a remark was made to the Eastern employee and the employee simply switched the call to the show host in the midst of the slander.
Furthermore, following the requirements to assist public access users pursuant to regulation 16-331a-11 is particularly important to cable users in this federal circuit. The second Circuit has made it clear that such users have an implied private cause of action against cable operators that exercise editorial control over use of the public access channel.McClellan v. Cablevision of Connecticut, Inc., 149 F.3d 161, 164-65 (CA 2, 1998); Moss, et al v. Cablevision systems Corp., 22 F. Sup.2d 1, 5
(E.D.N.Y., 1998). It does not take a great leap of the imagination to foresee the possibility of suits for damages or injunctive relief by public access users against cable operators wherein the users claim they are not receiving the level of support they claim they are entitled to under regulation 16-331a-11.
Secondly, the plaintiff argues that by its very language § 558 does not provide immunity from suit for the negligent or reckless acts of cable operators — the "potential areas for legal liability enumerated in the statute are intentional in nature" (last page of Brief, 9/15/00) those areas are as noted libel, slander, obscenity, incitement, invasion of privacy, false or misleading advertising or other similar laws. That is simply not so, for example in our state, as the defendant points out, in a defamation action, "a plaintiff need only prove . . . negligence in the failure to investigate the facts properly prior to publication." Miles v. Perry, 11 Conn. App. 584, 589 (1987). Also our court has recognized a cause of action for invasion of privacy,Goodrich v. Waterbury Republican American, Inc., 188 Conn. 107, 127
(1982). In that case, the court was dealing with the special problems presented by a suit against a newspaper based on an invasion of privacy which allegedly placed the plaintiff in a false light before the public. The court noted that federal law permits liability where "actual malice" is shown. But actual malice does not require that something be published where there is actual knowledge of its falsity. There can be liability even when reckless disregard for the truth is shown. Id., 129. False or misleading advertising claims rests on notions akin to the tort of negligent misrepresentation which by definition does not require an CT Page 3005 intent to mislead. cf. D'Ulisse — Cupo v. Board of Directors ofNotre Dame High School, 202 Conn. 206 (1987).
In any event, the court believes a broad reading of § 558 is required on the question of cable operator's immunity from suit because this statutory section must be read together with § 531(e). The court will now discuss that section.
 (b)
Section 531(e) sets forth the rule that a cable operator shall not exercise any editorial control over programs except that it can refuse to transmit a public access program which contains obscenity. Basically that is all this statutory subsection said until it was amended in 1996. Cases have held that "the obscenity exception is the single basis upon which a cable operator may exercise editorial control over public access programming." Goldberg v. Cablevision Systems Corp., 69 F. Sup.2d 398,402 (E.D.N.Y., 1999); Moss v. Cablevision Systems Corp., supra.
True, these just mentioned cases involve claims by public access users that the cable operator improperly exercised editorial control over their shows by refusing to transmit portions of them. But if the interpretation given to § 531(e) is correct it follows that if a cable operator cannot exercise editorial control over slander but can only exercise such control in the case of obscenity, then the cable operator cannot be sued civilly by a party that is slandered. Section 592 A of Restatement (Second) Torts has already been referred to which states that: "One who is required by law to publish defamatory matter is absolutely privileged to publish it." For example, the Restatement refers to the Federal Communications Act which requires broadcasting stations to give political candidates equal opportunity to be a station may thus be unable to refuse air time to a candidate or to control in any way what the candidate says. Thus the station is absolutely privileged.
The real question is what is the effect of the 1996 amendment to § 531(e) which made its language subject to § 544(d). The court concludes this amendment cannot be interpreted in such a way so as to make § 531(e) incomprehensible and contradictory, that is, § 544d says cable services shall not be provided or shall be provided subject to conditions, if such cable services are obscene or areotherwise unprotected by the Constitution of the United States." As previously discussed the underlined language goes beyond obscenity; for example, slander and libel are not protected by the federal constitution. But then what about the original language of § 531e — no editorial control except where obscenity, indecency or nudity are involved. Should the reference to § 544d in the same paragraph CT Page 3006 mean that the Federal legislature intended to say no editorial control except for these three items except wait, we really do not mean that, just look at § 544d which permits a cable operator to concern itself with more than obscenity? Is there no way to get off this predicament of circularity? The court suggests that there is a way out of this circularity. In other words, § 544(d) is not speaking about "editorial control" as such. Insofar as it applies to cable operators it seems to say that in their franchise application and renewal requests they can make it clear to the franchising authority that their cable services shall not be provided or provided with conditions if the services are obscene or otherwise are to present material not protected by the constitution. This would imply that when prospective public access users apply for air time, it is permissible to enforce the § 544(d) considerations in deciding whether to allow the applicants public access air time. But the cable operator would not have the right to exercise "editorial control" over a show that had actually been permitted to run or was in progress or on tape — that is there would be no right to delete portions of the show or prevent it or parts of it from being presented.
This interpretation allows some sense to be made out of § 531(e) as amended and would represent a balance between First Amendment concerns and the problem of providing access to the airwaves by people bent on slandering others. This is the case because it is not too heavy a burden to require cable operators to screen out obscenity — we are all supposed to recognize it when we see it. However, if operators had to face the prospect of liability when slander occurred on these programs by phone call ins or by guests on shows it would place an impossible screening job on cable operators. It is not quite as simple as delayed calls, or caller id or pulling the plug entirely on a show in progress, The law of defamation can be quite complicated insofar as determining what, if any, defenses apply and even whether defamation can be said to have occurred.
One other matter must be addressed by the court. The plaintiff implicitly rejects the court's conclusion that the cable operator could not exercise editorial control in this matter. If that were to be the case, then it cannot be argued that § 558 must be interpreted in such a way as to preclude the imposition of liability where slander might have occurred. The plaintiff argues that Eastern did not have to provide phone lines, the state regulations only require an "equipped studio" be provided and phone lines are not referred to in the definition given for such a studio and federal statutes do not refer to any such equipment as phone lines. "Editorial control" is only barred for programs operating within the "channel capacity" mandated by state regulations. CT Page 3007
The problem with this argument is that nothing in the statutes or regulations forbids the use of such phone line access. Also, the regulations are interestingly drawn with regard to equipment. Regulation16-331a-11 (e) is entitled "Facilities and Equipment". Although the operator must inform DPUC of all "equipment available for access use" (16-331-4 (3)), for all systems with more than 3500 subscribers subsections (c)(1) B, C and D state that public access users be provided with "equipment and facilities, including but not limited to, the following: an equipped studio. . . ." Regulation 16-331a-12 provides for review by the DPUC of "community access support levels and at least contemplates in subsection (7): "The existence of an agreement by the company (cable operator) to provide a level of support higher than that set by the standards in section 16-331a-11 which contains the reference to an "equipped studio." One of the considerations taken into account in any review is set forth in subsection (9) — "The fundamental purposes of community access, including but not limited to, the following: enhancing First Amendment rights providing for the dissemination of diverse views and for a market place of ideas and information." Phone lines on these talk shows are much more effective for accomplishing these goals than talking head studio interviews. Given the broad purpose of legislation and regulations providing for community access it would be difficult to arrive at a position that held that a cable operator would lose the immunity otherwise provided by § 558 because the cable operator provided equipment going beyond the bare minimum requirements of an "equipped studio" which thereby increased public access and participation in these public access channels. The reasoning of cases like Coville v. Liberty Mutual Ins. Co., supra, andVictoria v. Wilson, supra, which impose liability on gratuitous negligent actors does not apply to a situation where broad social policies would be encouraged and advanced by increasing public participation in public access channels. To argue that caller i.d. and delayed calls should be required if phone access is permitted in effect still makes the whole project of having open phone lines problematical given the previously mentioned difficulties of ascertaining when defamation claims are viable and some "security" methods such as caller i.d. might have a chilling effect on call ins. Also, we are dealing here with questions of federal policy — § 558 gives blanket immunity to cable operators in the public access area except for a limited type of programming involving obscenity. Beyond that, should a state trial judge have the right to weigh the goals of the dissemination of ideas that phone access provides against considerations such as the costs that might be imposed on cable operators by the expense of added security measures regarding phone access which might lead some cable operators not to have such public phone access for these programs?
Where would such reasoning lead? The safest course would be to have a CT Page 3008 show host speak into a camera with no live quests. If there were live quests they could say something slanderous — why wouldn't the cable operator be liable to the defamed party? The cable operator could presumably have a presence at any programming and pull the proverbial plug any time slander occurs — why not require then delayed tapes of shows?
The court does not believe 47 U.S.C. § 558 had all of this in mind. If Congress or state regulators decided phone access should be permitted only when certain steps are taken to prevent all possibility of defamation they should try to accomplish this by weighing the costs of such requirements against their benefit and the impracticality of such efforts as against the encouragement of an active market place of ideas and discussion.
In any event, for the foregoing reasons, the motion for summary judgment is granted.
Corradino, J.